In the

# United States Court of Appeals
### For the Seventh Circuit

No. 15-1371

GARY W. SGOUROS, on behalf of himself and all others similarly situated,

*Plaintiff-Appellee,*

*v.*

TRANSUNION CORPORATION, TRANS UNION LLC, and TRANSUNION INTERACTIVE, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 1850 — **James B. Zagel**, *Judge.*

ARGUED SEPTEMBER 29, 2015 — DECIDED MARCH 25, 2016

Before WOOD, *Chief Judge*, and EASTERBROOK and RIPPLE, *Circuit Judges*.

WOOD, *Chief Judge*. Hoping to learn about his creditworthiness, Gary Sgouros purchased a "credit score" package from the defendant, TransUnion. Armed with the number TransUnion gave him, he went to a car dealership and tried to use it to negotiate a favorable loan. It turned out, however,

that the score he had bought was useless: it was 100 points higher than the score pulled by the dealership. Believing that he had been duped into paying money for a worthless number, Sgouros filed this lawsuit against TransUnion. In it, he asserts that the defendant violated various state and federal consumer protection laws. Rather than responding on the merits, however, TransUnion countered with a motion to compel arbitration. It asserted that the website through which Sgouros purchased his product included (if one searched long enough) an agreement to arbitrate all disputes relating to the deal. The district court concluded that no such contract had been formed and denied TransUnion's motion. TransUnion has appealed from that decision, but we agree with the district court and affirm its order.

## I

On June 10, 2013, Sgouros purchased TransUnion's "3-in-1 Credit Reports, Credit Scores & Debt Analysis" for $39.90; he did so using TransUnion's website. In order to complete the purchase, Sgouros had to take three steps. First, he clicked on a large orange "Click Here" button on the homepage under the heading "Get Your Credit Score & Report." This click took him to a page headed with the message "Your FREE credit score & $1 credit report are only moments away." Here is what it looked like:



As the screenshot shows, the customer was told that he had to take three steps in order to obtain his "FREE credit score & $1 credit report." Step 1, pictured above, required Sgouros to furnish some identifying information and select "Yes" or "No" in response to a prompt that said "Please

send me helpful tips & news about my service, including special offers from TransUnion and trusted partners!" Sgouros answered these questions and clicked the large orange button labeled "Submit & Continue to Step 2." Step 2 is reproduced below:



It requires the customer to create an account user name and password and to type in his credit card information. It also asks "Is your home address the same as your billing address?" and offers "Yes" and "No" bubbles. Below these bubbles one can see a rectangular scroll window.

Inside the scroll window the words "Service Agreement" appear at the top. They are followed by two fully visible lines and a third that is chopped off horizontally but is legible enough to read. Including that third line, the visible text says "Welcome to the TransUnion interactive web site, membership tui.transunion.com (the "Site"). This Service Agreement ("Agreement") contains the terms and conditions upon which you ("you" or "the member") may access and use … ." (The version of the Service Agreement presented in TransUnion's brief includes the full third line, and it underlines the words "Service Agreement" and "the terms and conditions" in the visible text, even though there is no such underlining in the attached web page exhibit. These discrepancies, while troubling, do not affect our analysis.) Underneath the scroll box and to the right are the small hyperlinked words "Printable Version." Below those words was this paragraph, in bold text:

> You understand that by clicking on the "I Accept & Continue to Step 3" button below, you are providing "written instructions" to TransUnion Interactive, Inc. authorizing TransUnion Interactive, Inc. to obtain information from your personal credit profile from Experian, Equifax and/or TransUnion. You authorize TransUnion Interactive, Inc. to obtain

> such information solely to confirm your identi-
> ty and display your credit data to you.

Sgouros proceeded to Step 3 by clicking on the "I Accept & Continue to Step 3" button. Nowhere did this button require him first to click on the scroll box or to scroll down to view its complete contents, nor did it in any other way call his attention to any arbitration agreement. But, buried at page 8 of the full, 10-page printable version of the Service Agreement there was a purported arbitration agreement. In addition, the first page of the Agreement contains a brief statement indicating that it includes an arbitration clause and class action waiver.

Sgouros filed a putative class action suit against TransUnion under the Fair Credit Reporting Act, 15 U.S.C. § 1681g(f)(7)(A); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; and the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.010 *et seq.*, for misleading consumers by failing to inform them that the formula used to calculate their purchased credit scores was materially different from the formula used by lenders. We have jurisdiction to review the district court's denial of the motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(B).

## II

Our review of the issues on this appeal—the question whether an agreement to arbitrate arose, and the denial of TransUnion's motion to compel arbitration—is *de novo. Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (contract formation); *Int'l Bhd. of Elec. Workers Local 2150 v. Nex-*

*tEra Energy Point Beach, LLC*, 762 F.3d 592, 593-94 (7th Cir. 2014) (arbitrability). The relevant facts are not disputed.

A

As the Supreme Court repeatedly has emphasized, arbitration is a creature of contract. *E.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). We thus turn first to the question whether an agreement to arbitrate arose between TransUnion and Sgouros. TransUnion's primary support for the alleged agreement relies on Sgouros's act of clicking on the button that said "I Accept & Continue to Step 3." Courts around the country have recognized that this type of electronic "click" can suffice to signify the acceptance of a contract. See, *e.g.*, *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (applying California contract law and finding plaintiffs had not assented to arbitration clause in a license agreement located below the download button on a website offering free software). There is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257 (10th Cir. 2012) (finding that Florida and Oklahoma law would uphold the validity of acceptance using a click where customers could review the service terms in a scroll box and could not complete purchase without clicking "I Agree"); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236–37 (E.D. Pa. 2007) (finding a "click" agreement valid under California law because the user agreement was "immediately visible," contained a "prominent admonition in boldface to read the terms and conditions carefully, and with instruction to indicate assent if the

user agreed to the terms," and required the "affirmative action" of clicking "Yes"); *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 908 N.E.2d 1168, 1173 (Ind. Ct. App. 2009) (finding valid agreement for purposes of Indiana law where user had to click "Accept" under a box containing an "Acknowledgement and Agreement").

1

The present case, the parties agree, is governed by Illinois law. In Illinois, as in many states, the law governing the formation of contracts on the Internet is still in the early stages of development. But there is no reason to think that Illinois's general contract principles do not apply. Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question. See, *e.g., Beverly v. Abbott Labs.*, No. 15-1098, sl. op. at 6 (7th Cir. Mar. 16, 2016); *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 670 (Ill. Ct. App. 2004) ("'Intent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware."). Under the objective theory, intent to manifest assent in Illinois is revealed by "outward expressions such as words and acts." *Bank Computer Network Corp. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago*, 442 N.E.2d 586, 591 (Ill. Ct. App. 1982). The parties do not need to "share the same subjective understanding as to the terms of the contract." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987). But "there must be a meeting of the minds or mutual assent as to the terms of the contract." *Id.*

Generally, a party who signs a written contract is pre-sumed to have notice of all of the contract's terms. *Janiga*, 615 F.3d at 743. The trick here is to know how to apply these general principles to newer forms of contracting. In the con-text of cruise-ship tickets, which present problems similar to those of agreements formed on the Internet, Illinois courts have applied a "two-part 'reasonable communicativeness' test," under which they ask "(1) whether the physical charac-teristics of the ticket reasonably communicate the existence of the terms and conditions at issue" and "(2) whether the circumstances surrounding the passenger's purchase and subsequent retention of the tickets permitted the passenger to become meaningfully informed of its contractual terms." *Walker v. Carnival Cruise Lines, Inc.*, 889 N.E.2d 687, 694 (Ill. Ct. App. 2008). Translated to the Internet, we might ask whether the web pages presented to the consumer adequate-ly communicate all the terms and conditions of the agree-ment, and whether the circumstances support the assump-tion that the purchaser receives reasonable notice of those terms. This is a fact-intensive inquiry: we cannot presume that a person who clicks on a box that appears on a comput-er screen has notice of all contents not only of that page but of other content that requires further action (scrolling, fol-lowing a link, etc.) Indeed, a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact. We need, therefore, to look more close-ly at both the law and the facts to see if a reasonable person in Sgouros's shoes would have realized that he was assenting to the Service Agreement when he clicked "I Accept & Con-tinue to Step 3."

The closest Illinois case on point is *Hubbert v. Dell Corp.*, 835 N.E.2d 113 (Ill. Ct. App. 2005). The court there found that an online purchaser of a computer agreed to the seller's terms of service, which included an arbitration clause, when he completed the transaction. All five pages required to complete the purchase contained a visible hyperlink labeled "Terms and Conditions of Sale." *Id.* at 122. Additionally, the online forms stated, "All sales are subject to Dell's Term[s] and Conditions of Sale." The court considered the hyperlinked pages to be the same as pages in a physical contract. *Id.* It concluded that the statement indicating that sales were subject to the terms, combined with the hyperlinks, was sufficient to "place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase." *Id.*

What is notable about *Hubbert*, however, is how it differs from the present case. In *Hubbert*, Dell ensured that the purchaser would see the critical language before signifying her agreement. TransUnion did not. Indeed, the web pages on which Sgouros completed his purchase contained no clear statement that his purchase was subject to *any* terms and conditions of sale. The scroll box contained the visible words "Service Agreement" but said nothing about what the agreement regulated. The hyperlinked version of the Service Agreement was not labeled "Terms of Use" or "Purchase" or "Service Agreement," but rather just "Printable Version." And even indulging in the assumption that all visitors to this website are capable of reading the half-line of text, the visible words "This Service Agreement … contains the terms and … conditions upon which you … may access and use

… " fall short of providing notice that the purchase of a consumer credit score is subject to the agreement.

But what cinches the case for Sgouros is the fact that TransUnion's site actively misleads the customer. The block of bold text below the scroll box told the user that clicking on the box constituted his authorization for TransUnion to obtain his personal information. It says nothing about contractual terms. No reasonable person would think that hidden within that disclosure was also the message that the same click constituted acceptance of the Service Agreement.

Where the terms are not displayed but must be brought up by using a hyperlink, courts outside of Illinois have looked for a clear prompt directing the user to read them. *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752 (N.D. Cal. June 25, 2014) (California law); *Major v. McCallister*, 302 S.W.3d 227, 230 (Mo. Ct. App. 2009) (Missouri law); *Feldman*, 513 F. Supp. 2d at 236–37 (California law). One of Illinois's sister courts came to the sensible conclusion that where a website specifically states that clicking means one thing, that click does not bind users to something else. See *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013) (finding no contract formed pursuant to Washington law to purchase monthly "family safety report" from third party where plaintiff believed he was purchasing only a background check and report and final button read "YES And show my report"). No court has suggested that the presence of a scrollable window containing buried terms and conditions of purchase or use is, in itself, sufficient for the creation of a binding contract, and we have no reason to think that Illinois would be the first.

TransUnion undid whatever notice it might have been furnishing in its bold text block by explicitly stating that a

click on the button constituted assent for TransUnion to obtain access to the purchaser's personal information. That text distracted the purchaser from the Service Agreement by informing him that clicking served a particular purpose unrelated to the Agreement.

B

TransUnion has one back-up argument: it contends that even if Sgouros's clicking the "I Accept" button did not create a contract, his use of the site and the fact of purchase amounted to acceptance of the Service Agreement by conduct. In so arguing, TransUnion relies on *Hubbert*, as well as this Court's decisions in *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379 (7th Cir. 2007), and *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002). In *Treiber*, we found that the plaintiff was bound by a limitation of liability term where he had to agree twice to abide by the terms and conditions on UPS's website in order to ship his package. In *Boomer*, we found that a customer's continued use of AT&T's phone service constituted acceptance of new service terms that had been mailed to him in an envelope, the outside of which read: "ATTENTION: Important information concerning your AT&T service enclosed." The letter clearly stated that continued use would mean acceptance of the new terms.

*Treiber* and *Boomer*, however, do not help TransUnion either. The credit score purchase site did not contain any requirement that Sgouros agree to abide by any terms and conditions, nor did it warn the user that by completing a purchase he would be bound by the terms. The text stating that a purchase was conditioned on accepting the Service Agreement fell below what was visible on the site. TransUnion cannot manufacture notice where there was none.

### III

Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement. This is not hard to accomplish, as the enormous volume of commerce on the Internet attests. A website might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the agreement, or a clearly labeled hyperlink to the agreement, next to an "I Accept" button that unambiguously pertains to that agreement. There are undoubtedly other ways as well to accomplish the goal. Somehow or other, however, TransUnion needed to get the message through to the site user that purchasing a consumer credit score means agreeing to the Service Agreement. It failed to do so in this case, and so we agree with the district court that no agreement that included an arbitration clause arose between TransUnion and Sgouros. We therefore AFFIRM the order of the district court denying TransUnion's motion to send this case to arbitration and return the case to the district court for further proceedings.